UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

-v.-

DAVON HAWKINS,

Defendant.

21 Cr. 414-1 (KPF)

**OPINION AND ORDER**

DAVON HAWKINS,

Movant,

-v.-

UNITED STATES OF AMERICA,

Respondent.

24 Civ. 5953 (KPF)

KATHERINE POLK FAILLA, District Judge:

Davon Hawkins sold cocaine to undercover officers on two occasions in June 2019 as part of a drug-trafficking organization that infested an upper Manhattan housing project. In June 2023, Mr. Hawkins pleaded guilty to controlled substance and firearms charges pursuant to a written plea agreement with the Government, and in January 2024 he was sentenced principally to an aggregate term of imprisonment of 68 months. In June 2024, Mr. Hawkins moved for vacatur of his convictions pursuant to 28 U.S.C. § 2255, claiming ineffective assistance of counsel at the time of his guilty plea. For the reasons set forth in the remainder of this Opinion, the Court denies his motion.

## BACKGROUND[1]

### A.     Factual Background

In or about May 2019, law enforcement officers began investigating the trafficking of cocaine in the vicinity of the New York City Housing Authority's Johnson Houses, which are located in the square formed between East 112th Street, East 115th Street, Park Avenue, and Lexington Avenue. (PSR ¶ 20). The investigation disclosed a veritable open market for cocaine that thrived in multiple different courtyards and buildings of the Johnson Houses, and, more specifically, disclosed a drug-trafficking organization that sold cocaine and fentanyl inside and in the vicinity of 1830 Lexington Avenue. (*Id.* ¶ 21). That organization included Davon Hawkins, who twice sold cocaine to undercover officers in controlled buy transactions in June 2019. (*Id.* ¶ 29).

In February 2020, law enforcement executed a search warrant at Mr. Hawkins's residence, where they found a loaded .38 Special caliber firearm in his bedroom closet. (PSR ¶ 30). In addition, officers found a black zippered bag hanging from the door of Mr. Hawkins's bedroom closet containing 21 rounds of .38 Special cartridges; approximately $3,700 in cash; approximately

---

[1]     Unless otherwise indicated, references to docket entries in this Opinion pertain to the docket in the criminal case, *United States* v. *Hawkins*, No. 21 Cr. 414-1 (KPF). The Court refers to Mr. Hawkins's Revised Final Presentence Investigation Report as the "PSR" (Dkt. #333); to the transcript of his failed plea hearing of May 11, 2023, as "May 11, 2023 Tr." (Dkt. #189); to the transcript of his June 7, 2023 plea hearing as "Plea Tr." (Dkt. #213); to the transcript of his January 16, 2024 sentencing hearing as "Sent. Tr." (Dkt. #356); to his opening brief in support of his Section 2255 motion as "Def. Br." (Dkt. #359); to the affidavits of attorneys Kestine Thiele, Anthony Cecutti, and Calvin H. Scholar as "Thiele Aff." (Dkt. #363), "Cecutti Aff." (Dkt. #364), and "Scholar Aff." (Dkt. #367); and to the Government's brief in opposition as "Gov't Opp." (Dkt. #369). References to Mr. Hawkins's submission use the pagination provided by this Court's Electronic Case Filing ("ECF") system.

three plastic twists containing over 15 grams of marijuana; a small quantity of plastic containers containing cocaine; a pair of brass knuckles equipped with sharpened points; a digital scale; and empty Ziploc bags and plastic containers. (*Id.*).  On a tray beside Mr. Hawkins's bed, officers found crack cocaine packaged in small Ziploc bags; over 20 grams of cocaine packaged in large plastic twists; and a gravity knife.  (*Id.*).  Officers also seized a cellphone from Mr. Hawkins's bedroom, which cellphone contained communications between Mr. Hawkins and co-defendant Isaiah Smith regarding Smith re-supplying the defendant with cocaine.  (*Id.*).

## B.    Procedural Background

### 1.    The Indictment and the Arrest

On June 21, 2021, Mr. Hawkins alone was charged in a three-count sealed indictment with being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1); possessing with intent to distribute cocaine, in violation of 21 U.S.C. § 841; and using or carrying a firearm in furtherance of a drug trafficking offense, in violation of 18 U.S.C. § 924(c)(1)(A)(i).  (Dkt. #2).  On July 7, 2021, Mr. Hawkins was arrested and presented before Magistrate Judge James L. Cott; during these proceedings, attorney Calvin H. Scholar was appointed to represent Mr. Hawkins pursuant to the Criminal Justice Act (the "CJA").  (Dkt. #4, 6, 8).  The following week, Mr. Hawkins was arraigned by this Court in a proceeding held by videoconference.  (Dkt. #5 (order scheduling conference), 12 (transcript)).

On February 24, 2022, a superseding indictment was returned, S1 21 Cr. 414, which modified the controlled substance count of the underlying indictment to charge a conspiracy to distribute and possess with intent to distribute cocaine and fentanyl, in violation of 21 U.S.C. § 846, and which added as co-defendants Kwame Garnett, Isaiah Smith, Anthony Smith, Alan Vittar, Sadane Parsons, Dequan Garnett, Lakeshia Garnett, and Lucious Garnett. (Dkt. #23). A second superseding indictment, S2 21 Cr. 414 (the "Indictment"), was obtained one week later, on March 1, 2022; it added additional firearms charges against co-defendant Kwame Garnett. (Dkt. #54).

### 2.    The Guilty Plea

Trial in the matter was scheduled to begin on July 10, 2023. (Dkt. #111). However, the parties arrived at a pretrial disposition before the proposed trial commencement date and advised the Court in or about May 2023. Upon hearing of the parties' agreement to a pretrial disposition, the Court scheduled a guilty plea proceeding for Mr. Hawkins to take place on May 11, 2023. (Dkt. #178 (scheduling order)).

Prior to the proceeding, the Government presented Mr. Hawkins with a written plea agreement (the "Plea Agreement" or "Plea Agmt.") pursuant to which the guilty plea would be entered. (Dkt. #369-1 (Plea Agreement)). Among other things, Mr. Hawkins agreed to plead guilty to (i) a lesser-included offense of the narcotics conspiracy charged in Count One of the Indictment, which specified no mandatory minimum term of imprisonment, and (ii) the Section 924(c) offense charged in Count Two, which specified a mandatory

consecutive term of imprisonment of 60 months to any sentence imposed on Count One. (Plea Agmt. 1). Of potential note for the instant motion, the Count One conspiracy was specifically defined as a "conspiracy to distribute and possess with intent to distribute mixtures and substances containing a detectable amount of cocaine and mixtures and substances containing a detectable amount of fentanyl." (*Id.*). The parties also stipulated to the applicable sentencing range under the United States Sentencing Guidelines ("U.S.S.G." or the "Guidelines"), which they found to be 97 to 106 months' imprisonment, of which 60 months would be mandatory under Count Two. (*Id.* at 3). Among other things, Mr. Hawkins agreed not to appeal or to collaterally challenge a term of imprisonment within or below that range. (*Id.* at 4-5).

The May 11, 2023 plea proceeding started well enough, but quickly went off the rails. (May 11, 2023 Tr. 2-20). The Court began by confirming Mr. Hawkins's understanding that he was pleading guilty to the lesser-included offense of Count One and to Count Two. (*Id.* at 3-5 ). In this regard, the Court echoed the Plea Agreement in defining the narcotics conspiracy to include both cocaine and fentanyl. (*Id.* at 3-4). Mr. Hawkins confirmed that he understood. (*Id.* at 4). However, in attempting to ascertain Mr. Hawkins's competence to plead guilty, the Court learned from Mr. Hawkins that he had used marijuana about two hours prior to the proceeding, and, indeed, that he had been using it daily while on pretrial release. (*Id.* at 9-11). The parties agreed to put the matter over, and Mr. Hawkins then announced that he wished to change counsel. (*Id.* at 14-15). After questioning Mr. Hawkins further, the Court

5

relieved Mr. Scholar as counsel, and appointed Anthony Cecutti in his stead under the CJA. (*Id.* at 15-17).

On May 25, 2023, Mr. Cecutti advised the Court that "Mr. Hawkins has decided to plead guilty pursuant to the terms in the previously offered plea agreement rather than proceed to trial." (Dkt. #191). The Court scheduled a second plea proceeding for June 7, 2023. (Dkt. #193). The Court began that proceeding by confirming with Mr. Cecutti that Mr. Hawkins wished to plead guilty pursuant to the Plea Agreement previously extended by the Government. (Plea Tr. 2-4). After placing Mr. Hawkins under oath, the Court asked him a series of questions to confirm that he was competent to enter a guilty plea. (*Id.* at 5-10). It then confirmed that Mr. Hawkins had reviewed the Indictment with his attorney, and had had a sufficient opportunity to discuss the charges to which he intended to plead guilty and any defenses to those charges. (*Id.* at 10-11). The Court also reviewed with Mr. Hawkins the rights that he had, and would be waiving, by entering a guilty plea. (*Id.* at 11-17).

From there, the Court discussed with Mr. Hawkins the charges to which he proposed to plead guilty, the elements of those charges, and the penalties associated with them. It reminded Mr. Hawkins of their prior discussion on May 11, 2023, in which the Court had confirmed Mr. Hawkins's understanding that he was pleading guilty to both a lesser-included offense of Count One and to Count Two. (Plea Tr. 17-18). As relevant here, the Court confirmed that Mr. Hawkins was

> proposing to plead guilty today to what's called a lesser included offense, and that offense is conspiracy, or

> agreeing with others, to distribute or to possess with the
> intent to distribute mixtures and substances containing
> a detectable amount of cocaine *and mixtures and*
> *substances containing a detectable amount of fentanyl.*

(*Id.* at 17 (emphasis added)).  The prosecutor then recited for the Court and for

Mr. Hawkins the elements of the two offenses, including an object of the Count

One narcotics conspiracy that "involved mixtures and substances containing a

detectable amount of cocaine and fentanyl."  (*Id.* at 18-19).  The Court also

reviewed the penalties for each offense.  (*Id.* at 20-24).

    The Court reviewed the Plea Agreement with Mr. Hawkins, including its

waiver provisions.  (Plea Tr. 29-37).  Mr. Hawkins confirmed that he was

"agreeing not to appeal or to collaterally challenge any term of imprisonment

that is within or below the stipulated guidelines range of 97 to 106 months'

imprisonment."  (*Id.* at 35).  The Court also confirmed that Mr. Hawkins was

pleading guilty of his own free will, and not because of force or threats.  (*Id.* at

37).  When asked to explain what he did that made him believe he was guilty of

Counts One and Two, Mr. Hawkins admitted that "[f]rom May 2019 until

February 20, 2020, in Manhattan, I agreed with others to distribute and

possess with intent to distribute cocaine.  During that time period, in February

2020, I possessed a firearm in my home, with cocaine that I sold and money I

earned, for protection."  (*Id.* at 37-38).

    After listening to Mr. Hawkins's allocution, the Court inquired about the

fentanyl that had also been charged in the Indictment and discussed in the

Plea Agreement.  The Government responded that it was satisfied with Mr.

Hawkins's allocution: "The drug sales that Mr. Hawkins participated in directly

7

concerned cocaine.  The conspiracy as a larger matter included fentanyl sales, but the government is satisfied with Mr. Hawkins' allocution." (Plea Tr. 40). Mr. Hawkins did not object to that statement.  At the conclusion of the proceeding, the Court accepted Mr. Hawkins's guilty plea.  (*Id.* at 41-42).

### 3.    The Sentencing

The Probation Office prepared the Presentence Investigation Report (or "PSR") in anticipation of Mr. Hawkins's sentencing.  Its Guidelines calculations tracked those to which the parties had stipulated in the Plea Agreement.  (PSR ¶¶ 53-69, 113-115).  It recommended an aggregate term of 60 months' imprisonment.  (*Id.*, Sentencing Recommendation).  Mr. Hawkins filed a sentencing submission requesting the mandatory minimum term of 60 months' imprisonment (Dkt. #319),[2] while the Government filed a sentencing submission requesting a sentence within the Guidelines range of 97 to 106 months' imprisonment (Dkt. #326).

Sentencing took place on January 16, 2024.  (Sent. Tr.; *see also* Dkt. #332 (judgment)).  The Court began by discussing with the parties Mr. Hawkins's ignorance, during the relevant time period, that the charged conspiracy also trafficked in fentanyl.  As defense counsel noted, "Mr. Hawkins did not intentionally and knowingly sell fentanyl." (Sent. Tr. 4-5).  After discussing the matter with the parties, the Court modified the PSR to remove a

---

[2]    In Mr. Hawkins's sentencing submission, he explained that "[t]hough Davon only intended to sell cocaine and was not aware that coconspirators were trafficking fentanyl specifically, he knew the risks involved in participating in this kind of drug operation, and he irresponsibly and recklessly agreed to participate." (Dkt. #319).

reference to Mr. Hawkins "conspiring to distribute an unspecified quantity of fentanyl that does not affect the Guidelines calculation," and replacing it with a reference to Mr. Hawkins "admit[ing] to participating in a conspiracy that had as one of its objects the distribution of fentanyl." (*Id.* at 5; *see also id.* at 7 (confirming change with Mr. Hawkins)). The Court also agreed to "bake into the sentence that" it intended to impose credit for time Mr. Hawkins had spent in New York City custody. (*Id.* at 10). The Court then allowed each side to make an oral sentencing presentation, and allowed Mr. Hawkins to speak as well. (*Id.* at 13-39).

After taking a recess to consider the matter, the Court imposed sentence. The Court began by calculating the Guidelines in the same manner as had the parties and the Probation Office. (Sent. Tr. 40-41). It then considered how best to balance the sentencing factors set forth in 18 U.S.C. § 3553(a), and, more specifically, how much additional time was needed beyond the 60-month term specified in Count Two:

> I want to begin by noting that I think everybody agrees that the conduct in which Mr. Hawkins engaged is very bad conduct. And I'm aware from having presided over this case for the last almost three years that what that conduct did was to contribute to the decay and the debasement of an entire housing project. And given Mr. Hawkins' love for his children, which is obvious, and his concern about his family as demonstrated by his living situation with his aunt, I'm sure that he understands the value in children and families growing up in a neighborhood that is free or at least subject to reduced drug trafficking.
>
> And that's just something that has to be said. The conduct was bad. Let's all agree, the conduct was bad. I would note that each of the defendants in this case is

9

different. And Mr. Hawkins is different from his co-defendants. Sometimes in good ways. Sometimes in less good ways. He doesn't have the criminal history of some of his co-defendants. He doesn't have the degree of involvement or the length of the involvement, but he does have a significant involvement of approximately nine months, he does appear to have dealt in significant quantities of drugs as shown by his text with Isaiah Smith. And he does have the gun and perhaps other implements of violence.

There are in this case two counts, and Count Two for me is largely set. My hands are largely tied. I recognize that I could go above 60 months, but judges typically don't, and I wouldn't be doing that here. So the question for me is how much more is needed on Count One, how much more is needed to emphasize the seriousness of the conduct to promote respect for the law, to operate as just punishment, to promote deterrence and to prevent unwarranted disparities. I understood when Mr. Cecutti was explaining the advice that Mr. Hawkins had received early on in the case. I understood the arguments for staying in and then coming before me and saying, look, I've done these things. I've done my time. I should be let out.

But I think I agree with me that getting bail was a benefit for him. It was a benefit for his children of course as he's explained to me, but it was also a benefit for Mr. Hawkins [inasmuch] as he could show me that he could comply with the law for a period of time that amounted to several years; that he could obtain again legitimate employment; that he could care for his family, and I'm recognizing those efforts today.

I'm not willing to go all the way down to time served on Count One, but I am willing to vary significantly. I do think the conduct addressed by each count is different, and I think it should be addressed differently. But I believe only a small sentence is needed on Count One to achieve all of the purposes of sentencing. So I'm varying downward to … a term of eight months on Count One, followed by a 60-month sentence on Count Two….

(*Id.* at 41-43).

Mr. Hawkins surrendered to serve his sentence on or about March 22, 2024. The Bureau of Prisons currently projects his release date to be January 18, 2029.

### 4.    The Instant Motion

In July 2024, Mr. Hawkins moved to vacate or set aside his convictions pursuant to 28 U.S.C. § 2255, claiming ineffective assistance from his prior counsel in connection with his guilty plea. (Dkt. #359). In response, and given the nature of his allegations, this Court forwarded to Mr. Hawkins an attorney-client privilege waiver form (Dkt. #360), which he then returned (Dkt. #361). Mr. Cecutti filed his affidavit on September 23, 2024. (Dkt. #364). His associate, Kestine Thiele, filed her affidavit the same day. (Dkt. #363). Prior counsel Mr. Scholar filed his affidavit on September 26, 2024. (Dkt. #367). The Government filed its opposition submission on December 4, 2024. (Dkt. #369). Though given an opportunity to file a reply brief, Mr. Hawkins filed none.

### DISCUSSION

### A.    Applicable Law

### 1.    Motions Under 28 U.S.C. § 2255

A prisoner in federal custody may seek to have his sentence vacated, set aside, or corrected on the grounds that it "was imposed in violation of the Constitution or laws of the United States, or that the [trial] court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack[.]" 28

U.S.C. § 2255(a).[3]  However, the grounds for such a collateral attack under Section 2255 are much more limited than those available on a direct appeal.  *See United States* v. *Addonizio*, 442 U.S. 178, 185 (1979).  Relief may lie "only for a constitutional error, a lack of jurisdiction in the sentencing court, or an error of law or fact that constitutes 'a fundamental defect which inherently results in a complete miscarriage of justice.'"  *United States* v. *Bokun*, 73 F.3d 8, 12 (2d Cir. 1995) (quoting *Hill* v. *United States*, 368 U.S. 424, 428 (1962)); *accord Cuoco* v. *United States*, 208 F.3d 27, 30 (2d Cir. 2000).

"It is well established that a § 2255 petition cannot be used to 'relitigate questions which were raised and considered on direct appeal.'"  *United States* v. *Sanin*, 252 F.3d 79, 83 (2d Cir. 2001) (quoting *Cabrera* v. *United States*, 972 F.2d 23, 25 (2d Cir. 1992)); *accord United States* v. *Natelli*, 553 F.2d 5, 7 (2d Cir. 1977) ("[O]nce a matter has been decided adversely to a defendant on direct appeal it cannot be relitigated in a collateral attack[.]").  The sole exception is when "there has been an intervening change in the law and the new law would have exonerated a defendant had it been in force before the conviction was affirmed on direct appeal."  *Chin* v. *United States*, 622 F.2d 1090, 1092 (1980).  Section 2255 also precludes a defendant from bringing claims for the first time that could have been raised on direct appeal.  *See Bousley* v. *United States*, 523 U.S. 614, 622-23 (1998).  Where the petitioner has procedurally defaulted on a claim by failing to raise it on direct appeal, the

---

[3]    The caselaw refers to a person who files a Section 2255 motion alternatively as a "movant," a "petitioner," a "prisoner," or a "defendant."

claim may be raised pursuant to Section 2255 only if the petitioner can demonstrate (i) cause for the failure to raise the claim and prejudice from the alleged error, or (ii) actual innocence of the crime.  *Id.*

Cause can be established by showing that the default was the result of "some objective factor external to the defense."  *Murray* v. *Carrier*, 477 U.S. 478, 488 (1986).  To demonstrate prejudice, the petitioner must show "not just that the errors 'created a possibility of prejudice, but that they worked to his actual and substantial disadvantage.'"  *Borrego* v. *United States*, 975 F. Supp. 520, 522 (S.D.N.Y. 1997) (quoting *United States* v. *Frady*, 456 U.S. 152, 170 (1982)).

Alternatively, the petitioner may show that the federal court's refusal to consider the merits of his claim will result in a fundamental miscarriage of justice, because he is "actually innocent" of the crimes for which he was convicted.  *Aparicio* v. *Artuz*, 269 F.3d 78, 90 (2d Cir. 2001).  A court may find that a petitioner is actually innocent only when, after reviewing all of the evidence, it concludes that "no reasonable juror would have found petitioner guilty beyond a reasonable doubt."  *Doe* v. *Menefee*, 391 F.3d 147, 162 (2d Cir. 2004) (internal quotation marks omitted).

In resolving a motion under 28 U.S.C. § 2255, the district court is required to hold a hearing "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief."  28 U.S.C. § 2255(b); *see also, e.g., Pham* v. *United States*, 317 F.3d 178, 185 (2d Cir. 2003) (noting that 28 U.S.C. § 2255 does not permit summary dismissals of

motions that present facially valid claims).  That said, the filing of a Section
2255 motion does not automatically entitle the movant to a hearing — as, for
example, in instances in which a movant's allegations are "vague, conclusory,
or palpably incredible."  *Machibroda* v. *United States*, 368 U.S. 487, 495 (1962).
Rather, it is within the district court's discretion to determine the scope and
nature of a hearing.  *See Chang* v. *United States*, 250 F.3d 79, 85-86 (2d Cir.
2001) ("It was, therefore, within the district court's discretion to choose a
middle road [requiring a detailed affidavit from counsel] that avoided the delay,
the needless expenditure of judicial resources, the burden on trial counsel and
the government, and perhaps the encouragement of other prisoners to make
similar baseless claims that would have resulted from a full testimonial
hearing."); *cf. Thomas* v. *United States*, 93 F.4th 62, 66 (2d Cir. 2024) ("In many
cases, the district court may discharge this obligation by accepting affidavits
from the defendant's prior counsel, including those filed as part of the
government's opposition papers.").

### 2.    Ineffective Assistance of Counsel Claims

One potential basis for relief under Section 2255 occurs when a
defendant has received the ineffective assistance of counsel.  A defendant in a
criminal proceeding has a right under the Sixth Amendment to effective
assistance from his attorney at all critical stages of the proceeding, including
the entry of a guilty plea.  *See, e.g.*, *Hill* v. *Lockhart*, 474 U.S. 52, 58 (1985).

In order to succeed on a claim of ineffective assistance of counsel, a
movant must meet the two-pronged test established by *Strickland* v.

14

*Washington*, 466 U.S. 668 (1984).  *First*, the movant must show that his counsel's representation was deficient, falling below the objective standard of reasonableness.  *See id.* at 687-88.  During this first step, the standard of review is highly deferential and includes "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  *Id.* at 689.  "This presumption is overcome only if counsel failed to act reasonably considering all of the circumstances."  *United States* v. *Rosemond*, 958 F.3d 111, 121 (2d Cir. 2020).  A court evaluating arguments of ineffectiveness "must avoid the distorting effects of hindsight and consider the lawyer's perspective at the time the decision was made."  *Id.*  Moreover, the Second Circuit has made clear that an attorney does not provide ineffective assistance by failing to raise frivolous arguments, even where requested by a client.  *See, e.g.*, *Weingarten* v. *United States*, 865 F.3d 48, 53 (2d Cir. 2017).

*Second*, the movant must establish that his counsel's errors resulted in actual prejudice.  *See Strickland*, 466 U.S. at 694.  A movant satisfies this second prong by proving that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Id.*; *see also United States* v. *Nolan*, 956 F.3d 71, 79 (2d Cir. 2020).  "A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Garner* v. *Lee*, 908 F.3d 845, 862 (2d Cir. 2018).

In the specific context of guilty pleas, the prejudice analysis "focuses on whether counsel's constitutionally ineffective performance affected the outcome of the plea process."  *Hill* v. *Lockhart*, 474 U.S. at 59.  "In other words, in order

15

to satisfy the 'prejudice' requirement, the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Id.*; *see also Kovacs* v. *United States*, 744 F.3d 44, 51-52 (2d Cir. 2014) (discussing various ways that prejudice may be shown in the guilty plea context, including a forgone decision to proceed to trial or a more advantageous plea offer).  The defendant must "convince the court that a decision to reject the plea bargain would have been rational under the circumstances." *Padilla* v. *Kentucky*, 559 U.S. 356, 372 (2010).  In this regard, the Second Circuit "requires some objective evidence other than defendant's assertions to establish prejudice."  *Pham*, 317 F.3d at 182 (citing *United States* v. *Gordon*, 156 F.3d 376, 380-81 (2d Cir. 1998)).

A court is not required to conduct a *Strickland* inquiry in any particular order.  *See Strickland*, 466 U.S. at 697.  If the defendant does not successfully establish either the deficient performance prong or the prejudice prong, the entire claim fails, and the remaining, unaddressed step becomes moot.  *See id.*

## B.    Analysis

### 1.    The Court Will Not Enforce Mr. Hawkins's Appellate Waiver, Nor Will It Find Procedural Bar

While there are potential threshold hurdles to Mr. Hawkins's motion — in the form of his appellate waiver and the "cause and prejudice" standard set forth in cases like *Murray* v. *Carrier*, 477 U.S. 478 (1986) — the Court will proceed to consider the merits of his motion.  It does so on the theory that ineffectiveness of counsel, if proven by Mr. Hawkins, would suffice to surmount these procedural issues.  *See United States* v. *Hernandez*, 242 F.3d 110, 113-

16

14 (2d Cir. 2001) (noting procedural unfairness of using waiver provision to bar claims of ineffectiveness); *see also Massaro* v. *United States*, 538 U.S. 500, 508-09 (2003) (holding that "failure to raise an ineffective-assistance-of-counsel claim on direct appeal does not bar the claim from being brought in a later, appropriate proceeding under § 2255").

### 2.    Mr. Hawkins Has Not Shown Ineffective Assistance of Counsel

In his Section 2255 motion, Mr. Hawkins advances two claims of ineffectiveness against his attorney, without identifying the specific attorney to which he is referring.  *First*, Mr. Hawkins claims that his lawyer "threatened" and "manipulated" him to sign the Plea Agreement, by stating that the prosecutor had "dropped" the fentanyl and gun charges."  (Def. Br. 2).  *Second*, Mr. Hawkins claims that his attorney "scared" him by saying that Mr. Hawkins would "go to jail for 25 years" if he didn't accept the plea.  (*Id.*).

Given this imprecision, the Court requested affidavits from the three attorneys who represented Mr. Hawkins in this proceeding.  Kestine Thiele, who served as counsel with Anthony Cecutti, was not involved in plea discussions with Mr. Hawkins, and thus could not be the attorney to which he refers.  (Thiele Aff. ¶¶ 5-6).  Calvin Scholar, who originally negotiated the plea deal on behalf of Mr. Hawkins and represented him at the May 11, 2023 proceeding, avers:

> At no time did I lie, manipulate, or threaten Mr. Hawkins.  I never told Mr. Hawkins that a firearm charge had been "dropped" or dismissed or reduced in any way.  I never used force or threats or coerced or attempted to induce Mr. Hawkins to plead guilty and I

>    never told Mr. Hawkins that the Court would impose a
>    sentence of 25 years of incarceration.

(Scholar Aff. ¶ 7; *see also id.* ¶ 24 ("I never told Mr. Hawkins that he would

receive a 25-year prison sentence.  I never threatened or made Mr. Hawkins

feel fear in order to coerce him to plead guilty.")).  Mr. Scholar also reminds the

Court that during the May 11, 2023 failed plea proceeding, "Mr. Hawkins did

not state that I made him feel fearful or that I had tried to force him to plead

guilty.  In fact, I asked that the Court stop the proceedings rather than have

Mr. Hawkins continue with the change of plea hearing."  (*Id.* ¶ 35).

    Similarly, Mr. Cecutti, who represented Mr. Hawkins during the June 7,

2023 plea proceeding, avers that

>    In none of my communications with Mr. Hawkins did I
>    "lie, threaten or manipulate" Mr. Hawkins, as he seems
>    to accuse me of, to sign the written plea agreement.  Nor
>    did I tell him that he was only "being charged for
>    cocaine" and that "the prosecutor has dropped the gun
>    charge and the charge for fentanyl has been dropped."
>    Hawkins Mot. at 2.  I also did not tell Mr. Hawkins that
>    if he did not sign the plea agreement, he would go to jail
>    for 25 years.  Hawkins Mot. at 2.  Simply put, I did not
>    "force" or "trick" Mr. Hawkins to sign the plea
>    agreement.

(Cecutti Aff. ¶ 11).

    These sworn statements accord with the Court's own recollection of Mr.

Hawkins's guilty plea.  After all, the Court stopped the May 11 proceeding upon

learning that Mr. Hawkins had used marijuana two hours earlier, precisely

because of its concern that Mr. Hawkins would not be able to knowingly,

intelligently, and voluntarily waive his rights.  The Court observed nothing at

either plea proceeding to suggest that Mr. Hawkins was operating under force

or threat of force from any third party, much less his counsel.  And Mr. Hawkins's statements under oath to the Court that he had been neither threatened nor forced to enter a plea of guilty (Plea Tr. 37) are to be accorded a "strong presumption of verity," *Blackledge* v. *Allison*, 431 U.S. 63, 74 (1977); *see also United States* v. *Rivernider*, 828 F.3d 91, 105 (2d Cir. 2016); *cf. United States* v. *Torres*, 129 F.3d 710, 715 (2d Cir. 1997) ("A defendant's bald statements that simply contradict what he said at his plea allocution are not sufficient grounds to withdraw the guilty plea.").

There is simply no evidence that Mr. Hawkins was "threatened," "manipulated," or "scared" into entering his guilty plea by his attorneys or anyone else.  What is more, the supposed threats and misleading statements attributed to counsel are demonstrably false.  Mr. Hawkins could not credibly believe that the Government was dropping the firearms charge against him when the Plea Agreement and the Court's questioning made clear that the Count Two firearms charge was an integral part of the plea, and when Mr. Hawkins specifically admitted to possessing a firearm in his home "for protection" during his plea.  (*See* Plea Tr. 17-19, 37-38).  Similarly, Mr. Hawkins's current complaints about references to fentanyl in the Indictment and the Plea Agreement are belied by the record, since counsel was clear to note Mr. Hawkins's lack of direct involvement in fentanyl trafficking and the Court specifically modified the PSR in response to his stated concerns about being personally tagged with fentanyl.  Finally, Mr. Hawkins's throwaway reference to his firearm being "inoperable" (Def. Br. 2), even if true, is wholly

irrelevant to the Count Two charge to which he pleaded guilty. *See, e.g., United States* v. *Gravel*, 645 F.3d 549, 552 (2d Cir. 2011) (citing with approval *United States* v. *Castillo*, 406 F.3d 806, 817 n.3 (7th Cir. 2005) ("[t]here is no prerequisite that the gun be operable to be a 'firearm' under 18 U.S.C. § 924(c)")). This Court concludes that the record before it has been developed sufficiently to permit the Court to find that Mr. Hawkins pleaded guilty knowingly, intelligently, voluntarily, and with the effective assistance of counsel. In the absence of any showing of ineffectiveness, the Court must deny Mr. Hawkins's motion.

## CONCLUSION

The instant motion deeply troubles the Court. The Court varied downwardly from the Guidelines substantially at Mr. Hawkins's sentencing based in part on its belief in his rehabilitation, and it is now left to reconsider the wisdom of that decision in light of Mr. Hawkins's baldfaced lies in his motion papers. Ultimately, the Court finds no deficiencies with Mr. Hawkins's guilty plea proceeding or with the advice he received in connection with it. Accordingly, and for the reasons stated above, the Court DENIES Mr. Hawkins's motion under 28 U.S.C. § 2255. Because Mr. Hawkins has not made a substantial showing of the denial of a constitutional right with respect to his motion, the Court will not issue a certificate of appealability. *See* 28 U.S.C. § 2253(c). The Court further certifies under 28 U.S.C. § 1915(a)(3) that any appeal from this Opinion would not be taken in good faith, and therefore *in*

*forma pauperis* status is denied for the purpose of an appeal. *See Coppedge* v. *United States*, 369 U.S. 438, 444-45 (1962).

The Clerk of Court is directed to terminate the motion at docket entry 359 in Case No. 21 Cr. 414-1, to close Case No. 24 Civ. 5953, to file this Opinion in both cases, and to mail a copy of this Opinion to Mr. Hawkins at the following address:

        Davon Hawkins
        Reg. No. 53891-509
        FCI McKean
        Federal Correctional Institution
        P.O. Box 8000
        Bradford, PA  16701

        SO ORDERED.

Dated:    February 18, 2025
          New York, New York

_____
        KATHERINE POLK FAILLA
        United States District Judge